[No. 51339–2.   En Banc.   August 14, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. KENNETH
D. OXBORROW, *Appellant*.

*Robert H. Whaley, Robert A. Dunn,* and *Winston & Cashatt,* for appellant.

*Paul Klasen, Prosecuting Attorney,* for respondent.

*Norm Maleng, Prosecuting Attorney, Robert S. Lasnik, Chief of Staff,* and *Deborah J. Phillips, Senior Appellate Attorney,* amici curiae.

DURHAM, J.—Kenneth D. Oxborrow challenges the trial court's imposition of consecutive 10– and 5–year prison terms under the Sentencing Reform Act of 1981 (the SRA), RCW 9.94A, for the crimes of first degree theft and violation of a cease and desist order in connection with the sale of securities. Oxborrow was sentenced for activities related to a pyramid scheme in which he defrauded investors of over $58 million. Oxborrow claims that the sentences imposed are clearly excessive, that the trial court lacked authority to impose consecutive sentences, and that the trial court relied on impermissible evidence at the sentencing hearing. We affirm the sentences of the trial court on all counts.

I

In 1979, Oxborrow and allegedly two other persons started an investment business under the name Wheatland Investment Company. Oxborrow represented to potential investors that he would place their moneys into the commodities and futures markets and promised a return of approximately 2 percent *per week* on their investments. As Oxborrow attracted more and more investors, he began to pay off prior investors with the money obtained from newer

investors, creating an elaborate pyramid scheme. In all, Oxborrow obtained over $58 million, of which only $45 million was returned to the investors.

At most, Oxborrow placed only 10 percent of his investors' moneys into the commodities and futures markets. He appropriated a large portion of the remainder to satisfy his own extravagant tastes. During this period, he purchased two Rolls–Royce automobiles, a Cadillac limousine, several airplanes and an oceanside resort cabin worth several hundred thousand dollars. He decorated his office and home with fine leather furniture, expensive antiques and imported Chinese rugs. Other portions of his investors' moneys were used to cover past debts and to finance his own private business ventures.

Oxborrow's scheme attracted between 900 and 1,200 unsuspecting investors. They were drawn from a vast geographical base, including at least 15 counties in Washington, as well as parts of California, Idaho, Montana and Oregon. While some of the early investors made a profit, the majority lost money, and individual losses ranged as high as $2.4 million. Over 500 investors lost everything they had invested. Oxborrow's victims included pensioners, the elderly and the blind. He allegedly gained the confidence of some investors by making a show of his own supposedly ethical and honest behavior; large pictures of Jesus and other Christian items were on prominent display throughout his home and office.

On August 2, 1984, Oxborrow was served with a cease and desist order which directed him to stop selling or offering for sale any unregistered securities. This order was aimed at Oxborrow's investment scheme. Oxborrow ignored the order and ultimately accepted an additional $1 million from various investors. However, near the end of August, when he saw that he would be unable to pay back all his investors, he approached an attorney for advice. His attorney contacted the prosecuting attorneys for both the United States and Grant County to discuss Oxborrow's investment scheme and soon commenced plea bargaining.

For ease of prosecution, the Grant County Prosecuting Attorney was designated to represent the combined interests of prosecutors from the 15 affected Washington counties.

On October 31, 1984, Oxborrow pleaded guilty to theft in the first degree, RCW 9A.56.020(1)(a), and to willful violation of a cease and desist order concerning the sale of securities, RCW 21.20.390, by defrauding approximately 51 investors of over $1 million subsequent to July 1, 1984.[1] Under the SRA, the presumptive sentence ranges for these crimes are 0 to 90 days and 0 to 12 months respectively, since Oxborrow had no previous criminal history. RCW 9.94A.120(6), 9.94A.320. The statutory maximum sentences are 10 years in each case. RCW 9A.20.020(1)(b), 9A.56-.030(2), 21.20.400. The Grant County Prosecutor recommended that Oxborrow serve concurrent 10– and 5–year sentences for the two crimes, for a total term of 10 years. Instead, the trial court sentenced Oxborrow to consecutive 10– and 5–year sentences for a total term of 15 years.

Oxborrow appeals these sentences, claiming that they are "clearly excessive" under the SRA, and that the trial court had no authority to impose consecutive sentences under the SRA. Finally, Oxborrow claims that the trial court violated the SRA and denied him his constitutional right to due process of law by considering impermissible evidence both prior to and during his sentencing hearing. We deal with each of these contentions in turn.

---

[1] In the plea bargaining arrangement, Oxborrow also pleaded guilty to four federal crimes: (1) fraud by commodity pool operator, 7 U.S.C. §§ 6o(1), 13(b); (2) fraud in sales of securities, 15 U.S.C. §§ 77q(a), 77x; (3) mail fraud, 18 U.S.C. § 1341; and (4) conspiracy, 18 U.S.C. § 371. He received a 4–year sentence for these crimes. Oxborrow is not appealing this sentence.

Oxborrow further pleaded guilty to (1) theft in the first degree, RCW 9A.56-.020(1)(a), 9A.56.030(1)(a); and (2) fraud in the sale of securities, RCW 21.20.010, for wrongfully depriving and defrauding "hundreds" of investors of "millions" of dollars between January 1, 1982, and June 30, 1984. The sentences for these crimes are not governed by the SRA. The trial court sentenced Oxborrow to two consecutive 10–year probationary terms for these crimes, which are to run concurrently with the sentences for Oxborrow's post–SRA crimes. Oxborrow is not appealing these sentences.

## II

The Sentencing Reform Act of 1981 created presumptive sentencing ranges for most felonies based on the seriousness of the crime and the offender's criminal history. RCW 9.94A.320–.360. The sentencing court may impose any sentence within the presumptive range that it deems appropriate. RCW 9.94A.370. However, the court may also impose a sentence outside the range (an exceptional sentence) if it finds, "considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.120(2). The SRA provides a nonexclusive list of aggravating and mitigating factors which the sentencing court may consider in imposing an exceptional sentence. RCW 9.94A.390.

Either the defendant or the State may appeal an exceptional sentence. RCW 9.94A.210(2). The appellate court is to review the sentence as set out in RCW 9.94A.210(4):

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) *that the sentence imposed was clearly excessive* or clearly too lenient.

(Italics ours.) The pertinent provision of RCW 9.94A.210(4) is subsection (b).[2] As Oxborrow readily admits, the trial court's reasons for going outside the standard range are supported by the record and these reasons also unquestionably justify the imposition of an exceptional sentence; thus, subsection (a) is inapplicable. The issue here is if the *duration* of Oxborrow's exceptional sentence was justified, or, as Oxborrow argues, was "clearly excessive".

██ The SRA does not define the term "clearly excessive" nor otherwise explicitly indicate the standard of review to be used in determining if a particular sentence is

---

[2]An analysis of subsection (a) can be found in *State v. Nordby*, 106 Wn.2d 514, 517, 723 P.2d 1117 (1986) and *State v. Armstrong*, 106 Wn.2d 547, 549, 723 P.2d 1111 (1986), filed simultaneously with this opinion.

"clearly excessive". However, three important sources—the language of the SRA itself, the express recommendations of the Sentencing Guidelines Commission, and the Washington courts' previous interpretation of identical language in the juvenile justice act—clearly indicate that the sentencing court's decision regarding length of an exceptional sentence should not be reversed as "clearly excessive" absent an abuse of discretion. We hereby adopt that standard of review.

First, RCW 9.94A.010 provides in pertinent part:

> The purpose of [the SRA] is to make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which *structures, but does not eliminate, discretionary decisions affecting sentences . . .*

(Italics ours.) The SRA provides for structured decisions by requiring that any exceptional sentence be based on "substantial and compelling reasons" which justify going outside the standard range. RCW 9.94A.120(2), 9.94A.210(4)(a). Once this requirement has been met, however, the sentencing court is permitted to use its discretion to determine the precise length of the exceptional sentence. RCW 9.94A.390 provides a nonexclusive list of factors "which the court may consider *in the exercise of its discretion* to impose an exceptional sentence". (Italics ours.) The drafters of the statute recognized that "not all exceptional fact patterns can be anticipated", Washington Sentencing Guidelines Comm'n, *Implementation Manual* § 9.94A.390, Comment (1984), and that the sentencing court must be permitted to tailor the sentence to the facts of each particular case.

Second, the Sentencing Guidelines Commission, created by the Legislature in 1981 to develop the new sentencing standards, left no doubt as to standard of review it felt appropriate for determining when an exceptional sentence was clearly excessive:

> If the court sentences outside the standard range, it shall set forth its justification for doing so in written findings and conclusions, *and any sentence outside the standard*

*range shall be subject to review only for abuse of discretion.*

(Italics ours.) Washington Sentencing Guidelines Comm'n, *Report to the Legislature* 51 (Jan. 1983).

Third, the Washington courts have considered similar language in construing the Juvenile Justice Act of 1977. That act, like the Sentencing Reform Act of 1981, provides that sentences may be reversed if they are "clearly excessive". RCW 13.40.230(2)(b). In *State v. Strong,* 23 Wn. App. 789, 794, 599 P.2d 20 (1979), the court stated:

> The term "clearly excessive" is not defined in the Juvenile Justice Act of 1977 and, therefore, must be given its plain and ordinary meaning. Action is excessive if it "goes beyond the usual, reasonable, or lawful limit." Thus, for action to be *clearly* excessive, it must be shown to be clearly unreasonable, *i.e.,* exercised on untenable grounds or for untenable reasons, or an action that no reasonable person would have taken.

(Citations omitted.) We hold that a similar interpretation is to be given the words "clearly excessive" in the SRA.

■ In passing, we note that Oxborrow has urged this court to adopt the so–called "Minnesota rule", which generally limits exceptional sentences to no more than twice the presumptive sentence range. We decline to do so for several reasons. First, there is no statutory authority for applying such a rule, and no indication that the Legislature intended to impose this arbitrary limit on exceptional sentences. Second, if this rule were strictly applied in the present case, Oxborrow could be sentenced to no more than 180 days for the first degree theft charge, a grossly inappropriate punishment given the facts of the case. Finally, even the Minnesota courts have had difficulty in applying the "doubling rule". A number of cases have failed to strictly abide by the rule and have allowed greater sentences upon a finding of "severe" aggravating circumstances. *See State v. Norton,* 328 N.W.2d 142 (Minn. 1982); *State v. Ming Sen Shiue,* 326 N.W.2d 648 (Minn. 1982); *State v. Herberg,* 324 N.W.2d 346 (Minn. 1982). The court

in *State v. Norton, supra* at 146, elaborated on the difficulties with the doubling rule:

> The decision which we must make is whether this is one of the extremely rare cases in which more than a double durational departure is justified. There is no easy-to-apply test to use in making this decision, and there is no clear line that marks the boundary between "aggravating circumstances" justifying a double departure and "severe aggravating circumstances" justifying a greater than double departure.

*See State v. Stalker,* 42 Wn. App. 1, 4–5, 707 P.2d 1371 (1985). In *Stalker,* at 5, the Court of Appeals rejected the doubling rule and noted the following problems:

> Given Minnesota's own uncertainty in applying its newly articulated rule, our adoption of such a rule would not provide definitive guidance to the superior courts when imposing sentences outside the standard range. At best, the doubling rule could open a new area of uncertainty as to when a sentence greater than twice the standard range would be justified. The same confusion could result if the court reduced the sentence below the standard range. The concept of an undefined range between the maximum sentence available [by statute] and the presumptive sentencing range . . . was intended to allow the judge some degree of discretion in tailoring the sentence to the person and the crime before him. The adoption of any fixed restriction on the discretion of the sentencing judge is better left to the Legislature.

(Citation omitted.) We agree with this observation.

Applying the abuse of discretion standard to the facts of this case, we conclude that Oxborrow's sentence is not clearly excessive. Former RCW 9.94A.390 provides a list of aggravating factors that the sentencing court may consider when imposing an exceptional sentence:

> Aggravating Circumstances
>
> . . .
>
> (3) The offense was a major economic offense or series of offenses, so identified by a consideration of any of the following factors:
>
> (a) The offense involved multiple victims or multiple incidents per victim;

(b) The offense involved attempted or actual monetary loss substantially greater than typical for the offense;

(c) The offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

(d) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the offense.

Oxborrow's crimes fulfill *all* of the listed criteria for a "major economic offense". Considering only his activities subsequent to July 1, 1984, he defrauded at least 50 investors of over $1 million by the use of a highly sophisticated pyramid scheme in which he grossly abused his position of trust, confidence and fiduciary responsibility. Clearly the trial court was justified in relying on these aggravating factors.

The maximum statutory sentences for the crimes of violating a cease and desist order concerning the sale of securities and first degree theft are 10 years in each case. In addition to the 5-year sentence for the former crime, the trial court sentenced Oxborrow to the maximum, 10 years, on the theft charge. But this was no ordinary theft. RCW 9A.56.030(1)(a) provides that a person may be convicted of first degree theft for taking as little as $1,500; Oxborrow, subsequent to July 1, 1984, perpetrated a fraud involving more than a million dollars. Surely this is the quintessential crime for which the Legislature contemplated a maximum sentence. We find no abuse of discretion.

### III

Oxborrow next contends that the trial court exceeded its authority under the SRA by imposing consecutive, rather than concurrent, 10– and 5–year sentences. He further claims that even if the consecutive sentences are not illegal per se, the length of the consecutive sentences may not exceed the presumptive sentence ranges for his crimes. We disagree.

RCW 9.94A.400(1)(a) and (b) allow for consecutive sentences only for persons convicted of "three or more serious violent offenses [defined in RCW 9.94A.330 to include only

first and second degree murder, first degree assault, kidnapping, and rape] arising from separate and distinct criminal conduct . . ." In all other instances, the sentences are to be concurrent. Oxborrow's crimes admittedly do not meet the requirements of RCW 9.94A.400 for consecutive sentences.

However, former RCW 9.94A.390(4)(h) lists as an "aggravating circumstance" the possibility that:

> The operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly too lenient in light of the purpose of this chapter . . .

The Legislature thus recognized that the limitations on consecutive sentences in RCW 9.94A.400 might be inappropriate in exceptional cases. Here, the trial court was justified in finding that Oxborrow's presumptive sentence under RCW 9.94A.400—concurrent terms of 0 to 12 months and 0 to 90 days—would be "clearly too lenient", and that an exceptional sentence should be imposed.

■ Oxborrow contends that RCW 9.94A.390(4)(h) is an aggravating circumstance applicable only to cases involving the Uniform Controlled Substances Act rather than an aggravating circumstance applicable to all cases. This argument is without merit, as the comment to RCW 9.94A.390 clearly indicates:

> There was also concern that the multiple offense policy might sometimes result in a presumptive sentence that is clearly too lenient in light of the purposes of this chapter. An illustrative aggravating factor was inadvertently codified by the Code Revisor as part of the aggravating factors for drug offenses, rather than as a separate factor. (It is listed as "4(h)" rather than "5".) Both the Commission and the legislature intended for this example of an aggravating factor to apply to any crime, not just for violations of the Uniform Controlled Substances Act . . . As these are all illustrative factors only, the intent of the Legislature should control over such scrivener's error.

Washington Sentencing Guidelines Comm'n, *Implementation Manual* § 9.94A.390, Comment (1984).

■■ We next turn to RCW 9.94A.120(13), which provides:

A departure from the standards in RCW 9.94A.400(1) and (2) governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in subsections (2) and (3) of this section, and may be appealed by the defendant or the state as set forth in RCW 9.94A.210(2) through (6).

The sentencing court thus may impose consecutive sentences even if RCW 9.94A.400 does not so provide, but in such a case, the sentencing court must provide "substantial and compelling reasons" for its decision, set forth in written findings of fact and conclusions of law. RCW 9.94A.120(2), (3). There is no requirement that the length of the consecutive sentences not exceed the presumptive range; rather, when the consecutive sentences result in a total term exceeding the presumptive range, the defendant may appeal this sentence in the same way he would appeal any sentence outside the presumptive range.

Here, Oxborrow's presumptive sentence range was 0 to 12 months (using the longer of his two presumptive sentence ranges for first degree theft and violation of the cease and desist order), and his consecutive sentences total 15 years. This brings him within RCW 9.94A.210(4) which mandates reversal of the sentencing court's decision if (a) the reasons given by the sentencing judge do not justify a sentence outside the presumptive range, or (b) the total sentence is clearly excessive. As earlier indicated, Oxborrow does not challenge the adequacy of the trial court's reasons for imposing an exceptional sentence, but claims only that the sentence is "clearly excessive".

Thus, we apply the abuse of discretion test to Oxborrow's claim. Although the trial court did not make a separate listing of factors to justify both its decision to sentence Oxborrow to a term beyond the presumptive range on each of the two counts *and* to make those terms run consecutively, the same factors would apply to each decision. Oxborrow could have been sentenced to consecutive 10–

year terms, a total of 20 years, for his crimes; the trial court chose instead to impose a total term of 15 years. We hold that the trial court acted within its authority in imposing consecutive sentences and did not abuse its discretion in so doing.

## IV

Oxborrow contends that the trial court erred by admitting the testimony of three witnesses at his sentencing hearing and by including certain letters in the sentencing record. Oxborrow also claims that the trial court impermissibly looked beyond the charges to which he pleaded guilty in determining his sentence. We hold that Oxborrow has suffered, at most, harmless error from these alleged transgressions.

Oxborrow first objects to the trial court's decision to admit the testimony of Irene Ivory, Richard Park and John Maxwell at his sentencing hearing. Ivory and Park were listed as victims in the pre–SRA charges of securities fraud and first degree theft to which Oxborrow pleaded guilty. Maxwell headed the Enforcement Division of the Securities Division, Department of Licensing for the State of Washington, and had investigated Oxborrow's pyramid operation on behalf of the State. RCW 9.94A.110 permits the trial court to consider the testimony of both victims and an investigative law enforcement officer at the sentencing hearing. However, the prosecutor failed to give Oxborrow 3 days' notice that he would call these witnesses to testify. Oxborrow claims that this constituted a violation of Superior Court Criminal Rule 7.1(c). He further contends that the trial court, by admitting the testimony of the three witnesses, unconstitutionally denied him due process of law.

CrR 7.1(c) provides:

> At least 3 days before the sentencing hearing, defense counsel and the prosecuting attorney shall notify opposing counsel and the court of any part of the presentence report that will be controverted by the production of evidence.

Having examined the testimony of the three witnesses, we conclude that none of the testimony "controverts" the presentence reports; indeed, Oxborrow fails to point to any portion of the presentence reports that was supposedly controverted by the new testimony. However, we fail to see how Oxborrow has been prejudiced in any event. The testimony of Ivory, Park and Maxwell merely elaborates upon aspects of Oxborrow's conduct that are amply documented in both the presentence reports and the charges to which he pleaded guilty. The trial judge recognized as much, for he stated that the testimony at the sentencing hearing did not affect his decision as to Oxborrow's sentence.

Oxborrow next objects to the trial court's inclusion of certain letters in the sentencing record. Following Oxborrow's sentencing hearing in United States District Court, at which he received a 4–year sentence on federal charges (see footnote 1), the trial court in the present case received letters from both investors and members of the general public urging that a stiffer sentence be imposed for Oxborrow's state crimes. Some of these letters arrived too late to be included in the presentence reports. Oxborrow claims that he was entitled under RCW 9.94A.370 to an evidentiary hearing to challenge any alleged material facts in the letters, and that the trial court's consideration of the letters absent such a hearing denied him due process of law.

Again, even if we were to agree that Oxborrow was entitled to an evidentiary hearing concerning the letters, we find that any possible error in this respect is harmless beyond a reasonable doubt. The record contains, in addition to the letters critical of Oxborrow, many other letters written on his behalf. The trial judge stated that he considered all points of view, including the favorable letters, before sentencing Oxborrow. Moreover, it is clear that the trial judge did not rely on the letters to which Oxborrow objects for any material factual allegations found therein, but rather drew upon the presentence reports and the pleadings as the source of his factual findings. Oxborrow was not prejudiced by the trial court's consideration of the

letters in question.

Finally, Oxborrow argues that the trial court impermissibly looked beyond the charges to which he pleaded guilty in determining his sentence for his post–SRA crimes. In essence, he points out that his crimes subsequent to July 1, 1984 involved "only" the taking of $1 million from over 50 investors, even though the entire pyramid scheme, as revealed in the presentence reports, involved over $58 million. We conclude that the trial judge was justified in considering the additional information contained in the presentence reports since Oxborrow did not object to this information at the time of sentencing. RCW 9.94A.370 provides, in pertinent part:

> In determining any sentence, the trial court may use no more information than is admitted by the plea agreement, and admitted to or acknowledged at the time of sentencing. *Acknowledgment includes not objecting to information stated in the presentence reports.*

(Italics ours.) In any event, we fail to see how Oxborrow's post–SRA sentence would be clearly excessive even if his crimes were viewed as a "mere" $1 million fraud, since this greatly exceeds the $1,500 minimum requirement for a first degree theft conviction. The trial court acted within its authority in imposing consecutive 10– and 5–year terms for Oxborrow's post–SRA crimes.

The sentences of the trial court are affirmed.

DOLLIVER, C.J., and CALLOW, J., concur.

DORE, J., concurs in the result.

ANDERSEN, J. (concurring)—I fully concur with the majority opinion authored by Justice Durham, and the conclusion that there is no statutory or other compelling reason to adopt Minnesota's arbitrary "doubling rule". In fairness to the concurring/dissenting opinion, however, it seems obvious to me that, as a practical matter, an exceptional sentence of no more than twice the length of the presumptive sentence will on appellate review be less likely

to be held to constitute an abuse of discretion than one which probes the outermost limits of the statutory maximum. The egregious facts of this case amply justify the sentence imposed herein. There was no abuse of discretion; the sentence was not "clearly excessive."

BRACHTENBACH, J., concurs with ANDERSEN, J.

UTTER, J. (concurring in part, dissenting in part)—I agree with the majority that the crimes committed by Kenneth D. Oxborrow justify a sentence of 15 years. I disagree, however, with the majority's adoption of the "abuse of discretion" standard of review for criminal sentences. The reasons given by the majority for its conclusion are unsupported by the language of the act or its legislative history. I also disagree with the majority's rejection of Minnesota's "doubling" rule.

## I
### STANDARD OF REVIEW
The majority lists three sources to support its adoption of the abuse of discretion standard: (1) the language of the Sentencing Reform Act of 1981, (2) the recommendations of the Sentencing Guidelines Commission, and (3) a Washington court's interpretation of the juvenile justice act. None of these arguments is persuasive. First, the language of the act quoted by the majority does not support the majority's argument. The majority points to RCW 9.94A.010, which provides that:

> The purpose of this chapter is to make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders *which structures, but does not eliminate, discretionary decisions* affecting sentences . . .

(Italics mine.) The majority also points to RCW 9.94A.390, which provides a nonexclusive list of factors "which the court may consider in the exercise of *its discretion* to impose an exceptional sentence". (Italics mine.) Neither provision establishes an abuse of discretion standard of

review. RCW 9.94A.010 constitutes a grant of limited, structured discretion. RCW 9.94A.390 mentions "its discretion" only incidentally, without defining the nature of the court's discretion. The fact that these provisions grant a limited amount of discretion to trial courts does not support the majority's conclusion that the proper standard of review is whether the trial court abused that discretion.

Second, the majority points out that the Sentencing Guidelines Commission recommended that the Legislature prescribe the abuse of discretion standard for judicial review. The majority fails, however, to acknowledge the significant aspect of this recommendation: the Legislature refused to adopt it. The language quoted by the majority appears in RCW 9.94A.120(3) *without* the recommended abuse of discretion standard. In fact, the abuse of discretion standard does not appear anywhere in the sentencing reform act or the Sentencing Guidelines Commission's *Implementation Manual.*

Finally, the majority relies on allegedly similar language from Washington's juvenile justice act to argue that judicial constructions of that act should control judicial construction of this act. When the sentencing reform act was originally drafted, the provision describing the appropriate circumstances for an exceptional sentence was quite similar to the analogous provision in the juvenile justice act. D. Boerner, *Sentencing in Washington* § 9.3, at 9–5 (1985). However, the Sentencing Guidelines Commission replaced the language drawn from the juvenile justice act with language from Minnesota's determinate sentencing guidelines. The Commission believed that the Minnesota standard better accomplished the purposes of an exceptional sentence than did the Washington juvenile justice act standard. D. Boerner, § 9.3, at 9–6. The Commission therefore unanimously recommended that the Legislature adopt the Minnesota standard, and the Legislature concurred. D. Boerner, § 9.3, at 9–6. In light of the Legislature's rejection of the juvenile justice act standard, the majority's argument that this court should rely on decisions under the juvenile

justice act is not persuasive.

In other areas of law, appellate review traditionally serves as a legal mechanism to reconcile the myriad decisions of individual trial judges. Ozanne, *Bringing the Rule of Law to Criminal Sentencing: Judicial Review, Sentencing Guidelines and a Policy of Just Deserts,* 13 Loy. U. L.J. 721, 724 (1982). Under indeterminate sentencing schemes of criminal law, however, appellate courts are unable to produce a useful set of guiding principles. Ozanne, *supra* at 723; *see also* D. Boerner, § 9.2. Under such systems trial court judges are expected to use their own "learning, education, experience [and] philosophy" to decide how long to incarcerate an individual. Ringold, *A Judge's Personal Perspective on Criminal Sentencing,* 51 Wash. L. Rev. 631, 641 (1976). Legislatures do not provide any coherent principles with which appellate courts can reconcile these inevitably disparate decisions. D. Boerner, *supra*; Ozanne, *supra.* The result is close to chaos:

> The sentencing powers of the judges are, in short, so far unconfined that, except for frequently monstrous maximum limits, they are effectively subject to no law at all. Everyone with the least training in law would be prompt to denounce a statute that merely said the penalty for crimes "shall be any term the judge sees fit to impose." A regime of such arbitrary fiat would be intolerable in a supposedly free society, to say nothing of being invalid under our due–process clause. But the fact is that we have accepted unthinkingly a criminal code creating in effect precisely that degree of unbridled power.

M. Frankel, *Criminal Sentences: Law Without Order* 8 (1973).

Appellate review of sentencing decisions therefore is a key element in sentence reform. *See, e.g.,* D. Boerner, § 9.2; Knapp, *What Sentencing Reform in Minnesota Has and Has Not Accomplished,* 68 Judicature 181 (1984); Ozanne, *supra* at 721, 723; Comment, *The Standard of Appellate Review for Criminal Sentences in Illinois,* 1981 So. Ill. U. L.J. 261, 262; *Consistent Sentencing,* 63 Mich. B.J. 13

(1984). In Illinois, for example, the Illinois Legislature specifically replaced the abuse of discretion standard of review in an effort to improve the effectiveness of its determinate sentencing scheme. Comment, *supra* at 262–64. Determinate sentencing acts provide legislatively established sentencing policies and goals that appellate courts can use as tools with which to judge sentence lengths. D. Boerner, *supra*; Ozanne, *supra* at 741. Appellate courts must use these tools, however, to insure that individual trial courts properly apply the principles established by the Legislature.

The abuse of discretion standard advocated by the majority for review of exceptional sentences is inadequate for the purposes of sentencing reform. The abuse of discretion standard is extremely deferential. Under this standard an appellate court will overturn a trial court's decision only if the court's action was "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Only one Washington court has ever reversed a criminal sentence as an abuse of discretion. *See State v. Potts*, 1 Wn. App. 614, 464 P.2d 742 (1969); *State v. Armstrong*, 106 Wn.2d 547, 553, 723 P.2d 1111 (1986) (Goodloe, J., dissenting). Under this standard appellate courts cannot conduct the review necessary to achieve the uniformity and proportionality envisioned by the drafters of the sentencing reform act.

> Arbitrary or oppressive treatment of offenders by a trial judge in sentencing is not prevented by the abuse of discretion standard. . . . [u]nder the abuse of discretion standard, reviewing courts rarely consider improper influences or equalization of sentences imposed at the trial level. The issue of fairness of a sentence is secondary to the issue of legality. The abuse of discretion standard does not encourage the appellate court to look beyond the issue of legality to prevent arbitrary or oppressive sentences.

(Footnotes omitted.) Comment, *supra* at 270–71.

An abuse of discretion standard of review is appropriate

when (1) concerns of judicial economy dictate that the trial court be responsible for the decision, or (2) the trial judge is in a better position to make the decision because he can observe the parties. Neither circumstance is present here. First, in the sentencing reform act the Legislature addressed concerns of judicial economy by authorizing appeal of only those sentences that are exceptional. RCW 9.94A.210(1), (2). "By varying the access to sentence review in relation to sentences inside and outside the guidelines, the Washington legislature has . . . eliminated a major practical objection to appellate review of sentences." *Ozanne, supra* at 748. Second, the sentencing reform act has shifted the focus of a sentencing decision from observation of the individual defendant to objective consideration of statutory policies and guidelines. The length of an exceptional sentence thus should now be based on articulated factors instead of intuition, and a reviewing court can now weigh the factors considered by the trial court against the requirements of the act when it reviews a decision. *See* Comment, *supra* at 274. Under the new act, the abuse of discretion standard is no longer appropriate for reviewing the length of criminal sentences.

## II
### DOUBLING RULE

In addition to adopting the abuse of discretion standard of review, the majority rejects the Minnesota "doubling" rule. The Minnesota Supreme Court has ruled that generally a court that imposes a sentence outside of the sentencing guidelines should not impose a sentence more than double the presumptive sentence length. *State v. Evans,* 311 N.W.2d 481 (Minn. 1981). However, in "severe aggravating circumstances" the court will affirm longer sentences. *See, e.g., State v. Norton,* 328 N.W.2d 142 (Minn. 1982).

In this case I would hold that "severe aggravating circumstances" support Oxborrow's 15–year sentence. The Legislature has provided an illustrative, nonexclusive list

of aggravating circumstances that justify an exceptional sentence. *See* RCW 9.94A.390. Oxborrow's first degree theft and violation of a cease and desist order constitute exceptional examples of two of the four listed factors. First, Oxborrow knew that his victims were "particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health," RCW 9.94A.390(2); his victims included both elderly and blind individuals. Second, Oxborrow's crimes were a "major economic offense." RCW 9.94A.390(3). The scam involved "multiple victims." RCW 9.94A.390(3)(a). Between 900 and 1,200 investors participated in his scheme. Of these, over 500 lost everything they had invested. The offense involved "monetary loss substantially greater than typical for the offense". RCW 9.94A.390(3)(b). While first degree theft requires a theft of at least $1,500, RCW 9A.56.030, Oxborrow defrauded investors of $1 million *after* he received the court's cease and desist order. The scheme involved "a high degree of sophistication or planning", and lasted for 5 years. RCW 9.94A.390(3)(c). Finally, Oxborrow used a show of Christian piety to gain the trust of investors, and "used his . . . position of trust . . . to facilitate the commission of the offense." RCW 9.94A.390(3)(d). It is difficult to imagine a case that would better deserve a sentence close to the statutory maximum. In light of the extreme nature of Oxborrow's conduct, the trial court properly imposed a sentence of 15 years.

However, even though I agree with the majority that in this case the trial court properly imposed a sentence more than twice the length of the presumptive sentence, I do not agree that this court should categorically reject Minnesota's rule. The majority paints an inaccurate picture of the Minnesota rule. For example, the majority implies that under the Minnesota rule a trial court can never impose the statutory maximum sentence for a crime. This is not true. From the first time that it announced the rule, the Minnesota court has emphasized that courts faced with aggravating circumstances should neither automatically impose

twice the presumptive sentence nor consider a doubled sentence an absolute upper limit:

> After careful consideration of the problem in light of that experience, we conclude that *generally* in a case in which an upward departure in sentence length is justified, the upper limit will be double the presumptive sentence length. This is only an upper limit and we do not intend to suggest that trial courts should automatically double the presumptive length in all cases in which upward departure is justified nor do we suggest that we will automatically approve all departures of this magnitude. On the other hand, we cannot state that this is an absolute upper limit on the scope of departure because there may well be rare cases in which the facts are so unusually compelling that an even greater degree of departure will be justified.

*State v. Evans,* 311 N.W.2d at 483. The Minnesota approach thus is flexible enough to accommodate cases as extreme as this one.

The majority also argues that the rule is arbitrary. In contrast, the director of the Minnesota Sentencing Guidelines Commission has publicly praised the doubling rule of *State v. Evans, supra. See* Knapp, *supra.* When Minnesota's determinate sentencing guidelines first came into effect, many Minnesota judges were unused to the seemingly short sentences. These judges were not accustomed to the fact that determinate sentences represent "real" time, during which no opportunity for parole exists. As a result, Minnesota trial court judges frequently imposed sentences close to the statutory maximum in cases that did not warrant such long incarceration. The doubling rule of *State v. Evans, supra,* has helped Minnesota judges impose sentences that are more uniform and proportional, and empirically closer to the standards established by the Minnesota Legislature. Knapp, *supra* at 187.

Finally, the majority suggests that the Minnesota courts have had trouble applying the doubling rule. The only trouble experienced by the Minnesota courts has been the trouble experienced by any court trying to make a princi-

pled decision when comparing "apples and oranges." Commentators have praised Minnesota's efforts, even after adoption of the doubling rule. *See, e.g.,* D. Boerner, § 9.3, at 9–10; § 9.22(b); Knapp, *supra*; Ozanne, *supra* at 745 n.99.

This court should follow the example of the Minnesota court and attempt to establish a body of common law principles for imposing exceptional sentences. The length of a Washington presumptive sentence often is only a fraction of the length of the statutory maximum sentence, and Washington judges are as unused to these short sentences as the Minnesota judges were. Without the doubling rule a trial court has no guidance whatsoever when deciding where to fix the exceptional sentence. The doubling rule is necessary to insure that the principled guidelines envisioned by the drafters of the sentencing reform act become reality.

> A major hope of those who have advocated sentencing reform of this type has been that it would produce a "common law" of sentencing, in which the time–honored methods of the common law—reasons for decisions, appellate review of those reasons and the further articulation and rearticulation of reasons in the light of new circumstances—would be applied to sentencing. . . . If this expectation is met, sentencing decisions in Washington will, to a significantly greater extent than ever before, be based on principle and guided by reason, and much of the promise of the reform will be realized.

D. Boerner, § 9.3, at 9–9 through 9–10; *see also* § 9.22(b).

The Washington Legislature chose to leave some discretionary power in the trial courts when it established the Sentencing Reform Act of 1981. Throughout the act, however, the Legislature balances discretion against guidelines and restrictions. Appellate review is the act's most important check on the discretionary power of trial court judges to impose exceptional sentences. I do not agree with the majority that this court should review exceptional sentences only for abuses of discretion. This court should adopt the Minnesota doubling rule, and this court should

also subject exceptional sentences to the full power of review.

PEARSON and GOODLOE, JJ., concur with UTTER, J.

Reconsideration denied October 28, 1986.