IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

2017 MAY -1 AM 8:39
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74364-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEDRO CRENSHAW, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 1, 2017 |
| | ) | |

VERELLEN, C.J. — Pedro Crenshaw appeals his convictions for vehicular assault, hit and run injury accident, and hit and run unattended vehicle.

For the first time on appeal, Crenshaw argues the blood alcohol evidence was inadmissible because there were no circumstances justifying a warrantless blood draw. But he does not make an affirmative showing of actual prejudice, thus the issue is not a manifest constitutional error reviewable under RAP 2.5(a)(3).

He also argues his counsel was ineffective for failing to move to suppress the results from the blood draw. But Crenshaw is unable to show counsel's performance was deficient or resulted in prejudice.

Crenshaw challenges the jury determination that the victim's injuries substantially exceeded the level of bodily harm necessary to satisfy the elements of the vehicular assault statute. But the record contains evidence the victim suffered life threatening and altering injuries, including loss of his left eye, permanent paralysis to the left side of

his face, and loss of teeth. His treating doctor testified that he has permanent irreversible disability from his injuries.

Crenshaw also challenges RCW 9.94A.535(3)(y) for vagueness. Because State v. Baldwin[1] precludes a vagueness analysis for aggravating circumstance sentencing guidelines statutes, his argument fails.

Finally, because the 36-month sentence was based on tenable grounds and reasons and its length did not shock the conscience, Crenshaw's sentence was not excessive.

Therefore, we affirm.

## FACTS

Juan Quintanilla and Pedro Crenshaw met through their employment at Boeing in Texas in 2009. In July 2013, Quintanilla and his wife moved to Washington. The Quintanillas moved into a room in Crenshaw's home in Snohomish, Washington while they looked for permanent housing.

On September 12, 2013, the Quintanillas finished dinner and were about to watch a football game at Crenshaw's home when Crenshaw pulled into the driveway. Crenshaw asked Quintanilla if he wanted "to go for a ride," and Quintanilla got into the passenger seat.[2]

### I. The Collision

Around 7:00 p.m. that evening, Kisha Floren was driving on Lowell Larimer Road, a rural two lane road with a 35 mile per hour posted speed limit. Floren "heard the

---

[1] 150 Wn.2d 448, 78 P.3d 1005 (2003).

[2] Report of Proceedings (RP) (Oct. 30, 2015) at 804.

revving of a large engine," looked in her rearview mirror, and saw Crenshaw's car "running up behind" her.[3] Crenshaw passed Floren and the car in front of her by crossing the double yellow center line into the oncoming lane of traffic. Floren testified that Crenshaw's speed was "increasing and definitely much, much faster than I was going."[4] Crenshaw then got back into his lane, but missed a curve. His car went through two fences and hit two parked cars in the driveway of a home, pushing both of the parked cars into a wooden fence before stopping. Crenshaw got out of the car, "popped his head back into the vehicle to look in," and then fled.[5] As Crenshaw walked away from the scene, he saw Floren and waved her off.

Angela and Gavin Loth live near where the collision occurred. Crenshaw crossed the Loth's property on foot and tried to hide in the woods, but Mr. Loth and a friend found him and turned him over to the police. Crenshaw repeatedly said, "I killed my buddy. I killed my buddy."[6]

Police performed a walkthrough of the scene and did not find evidence of tire marks or skid marks on the roadway. Three wooden boards had penetrated the windshield of Crenshaw's car, and there was substantial damage to the driver's side of a truck that Crenshaw's car collided with. The truck had been pushed into a car that was then pushed into a fence. The car sustained substantial damage on both sides. Evidence from the scene and the "black box" in Crenshaw's car showed that he did not

---

[3] RP (Oct. 27, 2015) at 203.

[4] Id.

[5] Id.

[6] Id. at 257; RP (Oct. 28, 2015) at 393, 395; RP (Oct. 27, 2015) at 213 (Floren testified Crenshaw "was very distraught and crying and saying, 'I killed my best friend.'").

activate the brakes and was travelling 104 miles per hour 3.5 seconds before impact. The car went into a partial broadside as it traveled through a ditch, but straightened out before colliding with the truck. The car had no mechanical defects that contributed to the collision.

## II. Alcohol Consumption

That day, Crenshaw got off work around 4:00 or 4:30 and met some friends at the Mukilteo Lodge. Crenshaw "had some beers and some whiskey" before he drove home and asked Quintanilla to go for a ride.[7]

After police arrested Crenshaw, they noticed "an obvious smell of intoxicants" coming from Crenshaw.[8] Police took Crenshaw to the hospital at 8:57 p.m. Deputy Monson submitted a draft of a search warrant for Crenshaw's blood to a deputy prosecuting attorney at approximately 9:30 p.m. According to Deputy Monson, by the time he submitted the draft to the deputy prosecuting attorney, "it was already within minutes of reaching that two-hour window."[9] And by the time the deputy prosecuting attorney returned it requesting additional information, "we were beyond the two hours."[10] He explained, "[A]lcohol in the system may be metabolized and diminishing as time passed, if we got beyond the two-hour time frame that he was going to take a blood sample."[11]

---

[7] RP (Oct. 30, 2015) at 802.

[8] RP (Oct. 29, 2015) at 565.

[9] RP (Oct. 28, 2015) at 406.

[10] Id.

[11] Id. at 407.

The police obtained a sample of Crenshaw's blood at 10:15 p.m. without a search warrant, approximately three hours after the collision.[12] Crenshaw fell asleep for about 30 minutes at the hospital while waiting for the blood draw. The blood test showed an alcohol concentration of .089 grams per 100 milliliters of blood.

### III. Quintanilla's Injuries

Detective Barker was first on the scene. He noticed the passenger air bag in Crenshaw's car had been deployed and was covered in blood. He saw the left side of Quintanilla's face "was completely gone," and there was only a hole where his mouth and nasal cavity had been.[13] A portion of his face and one eye were still partially attached. Although Detective Barker "didn't believe [Quintanilla's] injuries were at that point survivable" and he did not appear to be breathing, Quintanilla came to and began breathing.[14] The aid car transported Quintanilla to Harborview Medical Center.

Dr. Dillon, the acting chief of oral and maxillofacial surgery, described his severe injuries as "it was like someone had taken a machete and just cleaved his face in half."[15] Dr. Dillon testified that Quintanilla's left eye had ruptured, his "left ear canal [was] completely severed down to the skull base," and his facial nerve was severed, causing permanent paralysis on the left side of his face.[16] Dr. Dillon spent about 14 hours in surgery to clean out Quintanilla's wound and reassemble his facial bones. Quintanilla

---

[12] RP (Oct. 29, 2015) at 486 ("It was completed at 2215 hours.").

[13] RP (Oct. 28, 2015) at 375-77.

[14] Id. at 375-76.

[15] RP (Oct. 27, 2015) at 227-28.

[16] Id. at 230.

had other surgeries to put in partial dental implants[17] and skin grafts. At the time of trial, Dr. Dillon estimated Quintanilla would require at least six more surgeries over the following two years to be "even vaguely functional."[18] Dr. Dillon testified,

> So our goal is to try to make him more functional. You know, it's a permanent irreversible disability, but we want him to be able to live through it, get a job, move forward without people staring at his face or the fact he doesn't have an eye and why does he have a patch on his eye.[19]

Quintanilla also suffered a brain injury. He was confused and unable to walk, talk, or write, and required therapy to regain those skills. He suffered from memory loss and his judgment was affected.

### IV. Trial and Sentencing

The charges against Crenshaw included vehicular assault, hit and run injury accident, and hit and run unattended vehicle.[20] The special verdict form asked:

> If you find the defendant guilty of Vehicular Assault as charged in Count 1, then you must determine if the following aggravating circumstance exists:
>
> Whether the victim's injuries substantially exceeded the level of bodily harm necessary to constitute substantial bodily harm as defined in instruction 17.[21]

Jury instruction 17 reads:

> Substantial bodily harm means bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but

---

[17] Dr. Dillon was unable to give Quintanilla dental implants in his upper jaw because there was no bone or soft tissue.

[18] RP (Oct. 27, 2015) at 231-32.

[19] Id. at 233.

[20] Crenshaw was also charged with driving while license suspended in the third degree, to which he pleaded guilty on the first day of trial.

[21] Clerk's Papers (CP) at 69.

substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part.[22]

The jury found Crenshaw guilty of vehicular assault, hit and run injury accident, and hit and run unattended vehicle. The jury made a special finding that the injuries substantially exceeded those necessary to prove the crime of vehicular assault. The court imposed a 36-month sentence.

Crenshaw appeals.

## ANALYSIS

### I. Warrantless Blood Draw

For the first time on appeal, Crenshaw argues the blood alcohol evidence was inadmissible because there were no exigent circumstances justifying the warrantless blood draw.

As a general rule, this court will not consider issues for the first time on appeal.[23] A claim of error may be raised for the first time on appeal if it is a "manifest error affecting a constitutional right."[24] This exception to the general rule "is not intended to afford criminal defendants a means for obtaining new trials whenever they can identify some constitutional issue not raised before the trial court. Rather, the asserted error must be 'manifest'—i.e., it must be 'truly of constitutional magnitude.'"[25] A defendant must identify a constitutional error and show how, in the context of the trial, the alleged

---

[22] CP at 58.

[23] RAP 2.5(a).

[24] RAP 2.5(a)(3); State v. Scott, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988); State v. Lynn, 67 Wn. App. 339, 342, 835 P.2d 251 (1992).

[25] State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (quoting Scott, 110 Wn.2d at 688)).

error actually affected the defendant's rights.[26] "[I]t is this showing of actual prejudice that makes the error 'manifest', allowing appellate review."[27] "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest."[28]

Here, because no motion to suppress was made, the record was not fully developed as to all of the reasons why the police decided not to pursue a search warrant. On this record, Crenshaw does not establish whether the trial court would have granted the motion. Without an affirmative showing of actual prejudice, the asserted error is not manifest and thus is not reviewable under RAP 2.5(a)(3).

## II. Ineffective Assistance of Counsel

Crenshaw argues his counsel was ineffective for failing to suppress the blood draw evidence. Generally, ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice.[29]

Specifically, regarding a failure to move to suppress evidence, the defendant must show the trial court likely would have granted the motion if made.[30] A mere allegation of prejudice is insufficient; actual prejudice must appear in the record.[31]

---

[26] Id. at 333.

[27] Id.

[28] Id.

[29] Id. at 334-35; Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

[30] McFarland, 127 Wn.2d at 333-34.

[31] Id. at 334.

Crenshaw contends the State focused on the blood evidence at trial and the only evidence of the "reckless manner" alternative means[32] the State presented was Crenshaw's speed. But as discussed previously, the record before us is insufficient to establish that a motion to suppress would have been granted.

Further, even if counsel had raised and won the motion to suppress, the absence of the blood alcohol evidence would not have altered the outcome of the trial. The record contains other evidence that Crenshaw had been drinking alcohol before the collision and that his consumption impaired his ability to drive. The State also presented compelling alternative means evidence that Crenshaw was driving at excessive speeds on a curving rural two-lane road and failed to brake.

We conclude Crenshaw fails to demonstrate prejudice.

### III. Sufficient Evidence to Support the Aggravating Circumstance

Crenshaw argues there was insufficient evidence for the jury's finding that Quintanilla's injuries substantially exceeded the level necessary to establish the elements of the offense.

Facts supporting an aggravating circumstance must be proved to a jury beyond a reasonable doubt.[33] Evidence is sufficient to meet that standard if, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements beyond a reasonable doubt.[34] A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences drawn

---

[32] CP at 47 ("(a) operated or drove the vehicle in a reckless manner; or (b) was under the influence of intoxicating liquor") (emphasis added).

[33] RCW 9.94A.537(3).

[34] State v. Yarborough, 151 Wn. App. 66, 96, 210 P.3d 1029 (2009).

therefrom.[35] "Circumstantial evidence and direct evidence are equally reliable for purposes of drawing inferences."[36]

A trial court can impose an exceptional sentence under RCW 9.94A.535(3)(y) if the jury finds the victim's injuries *substantially exceed*[37] the level of bodily harm necessary to satisfy the elements of the offense and the court is satisfied that this is a substantial and compelling reason to justify an exceptional sentence.[38] The trier of fact must compare the actual injuries against the minimum injury that would satisfy the definition of the charged crime.[39] The minimum injury for vehicular assault is substantial bodily harm.[40] "Substantial bodily harm" means "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part."[41] To determine whether an injury "substantially exceeds," our Supreme Court has noted "'[s]uch a leap is best understood as the jump from 'bodily harm' to 'substantial bodily harm,' or from 'substantial bodily harm' to 'great bodily harm.'"[42] The jump between statutory categories of harm meet the "substantially exceed" test, but injuries can "substantially exceed" one category of harm without

---

[35] Id.

[36] Id.

[37] See LAWS OF 2005, ch. 68, § 1 (codified at RCW 9.94A.535); Blakely v. Washington, 542 U.S. 296, 305, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2003).

[38] State v. Pappas, 176 Wn.2d 188, 192, 289 P.3d 364 (2012).

[39] Id.

[40] RCW 46.61.522

[41] RCW 9A.04.110(4)(b).

[42] Pappas, 176 Wn.2d at 192 (alteration in original) (quoting State v. Stubbs, 170 Wn.2d 117, 130, 240 P.3d 143 (2010)).

necessarily reaching the severity of the next category.[43] The language of RCW 9.94A.535(3)(y) supports this rationale by only requiring that the injuries "substantially exceed" rather than a requirement to meet a higher category of harm.[44]

Crenshaw points to two Washington vehicular assault cases where our Supreme Court held a finding of excessive injury was unsupported where it was based on injuries contemplated within the standard range.[45] But those cases were decided under the pre-2001 version of the vehicular assault statute that required a higher level of harm, i.e., that the defendant proximately caused serious bodily injury while acting in a reckless manner or under the influence of alcohol or drugs.[46] That level of injury was defined as "bodily injury which involves a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body."[47] In 2001, the statute was amended to eliminate the proximate cause requirement, to include an additional means of committing vehicular assault by showing disregard for the safety of others, and to lower the harm requirement from serious bodily injury to substantial bodily harm.[48]

Here, Quintanilla's injuries substantially exceeded substantial bodily harm because he suffered devastating permanent loss of bodily parts and serious permanent disfigurement. Half of Quintanilla's face was sheared off in the collision. He lost an

---

[43] Id.

[44] Id. at 192-93.

[45] State v. Nordby, 106 Wn.2d 514, 519, 723 P.2d 1117 (1986); State v. Cardenas, 129 Wn.2d 1, 6-7, 914 P.2d 57 (1996).

[46] See Pappas, 176 Wn.2d at 193-94 (citing former RCW 46.61.522 (1996)).

[47] Id. at 194.

[48] Id.

eye, his teeth, and the bone on the left side of his face. Where his left eye used to be, there was now an open wound with no orbit. There was insufficient bone and muscle remaining for him to use an artificial eye. He is unable to have full dental implants because there is no bone in his top jaw. His left ear canal was severed down to the skull. The nerves that control the left side of his face were severed and he will have permanent paralysis on that side of his face. He has no control over the left side of his mouth, which affects his speech. Dr. Dillon testified that Quintanilla has permanent irreversible disability from his injuries.

Quintanilla also suffered a brain injury that resulted in a cognitive disability. He had to relearn how to walk, talk, and write. His short and long term memory and judgment were impaired.

We conclude the State presented sufficient evidence that Quintanilla's injuries substantially exceeded the level of bodily harm in RCW 46.61.522.

### IV. Vagueness Challenge

Crenshaw argues that RCW 9.94A.535(3)(y) and the related jury instructions are unconstitutionally vague.

"[T]he due process vagueness doctrine under the Fourteenth Amendment and article I, section 3 of the state constitution requires that citizens have fair warning of proscribed conduct."[49] A vagueness analysis comprises two due process concerns.[50] "First, criminal statutes must be specific enough that citizens have fair notice of what conduct is proscribed. Second, laws must provide ascertainable standards of guilt to

---

[49] State v. Bahl, 164 Wn.2d 739, 752, 193 P.3d 678 (2008).
[50] State v. Baldwin, 150 Wn.2d 448, 458, 78 P.3d 1005 (2003).

12

protect against arbitrary arrest and prosecution."[51] Both prongs focus on laws that "prohibit or require conduct."[52]

Crenshaw concedes that our Supreme Court has held in State v. Baldwin that aggravating circumstance sentencing guidelines statutes are not subject to a vagueness analysis.[53] The Baldwin court also determined that the sentencing guideline statute does not create "a constitutionally protectable liberty interest."[54] Crenshaw contends Baldwin is no longer good law following the United States Supreme Court's decision in Blakely v. Washington.[55] But Crenshaw has not provided any compelling argument suggesting how Blakely, a decision looking to the Sixth Amendment right to a jury trial, has modified the due process vagueness analysis in Baldwin.[56]

Under Baldwin, we must conclude a vagueness challenge is unavailable to Crenshaw.

### V. Excessive Sentence

Crenshaw contends the imposition of a 36 month sentence was clearly excessive because its length shocks the conscience.

---

[51] Id.

[52] Id.

[53] 150 Wn.2d 448, 461, 78 P.3d 1005 (2003).

[54] Id.

[55] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[56] Crenshaw argues that Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d. 435 (2000) rendered Baldwin invalid. But Apprendi was decided three years before Baldwin and held that a state hate crime statute which authorized an increase in the maximum prison sentence based on the judge's finding by a preponderance of the evidence violated due process. But here, the aggravating factors were left to the province of the jury, not judicial discretion.

13

We review an exceptional sentence for abuse of discretion.[57] To reverse an exceptional sentence:

> [T]he reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.[58]

To show that that the sentence is clearly excessive, the defendant must show that the sentence is clearly unreasonable, that it is exercised on untenable grounds or for untenable reasons, or that it is a sentence that no reasonable person would have imposed.[59] If it is based on tenable grounds or reasons, then it is *only* excessive if its length, in light of the record, "shocks the conscience."[60] The review is limited to the record before the sentencing court.[61]

Here, the sentence imposed was based on tenable grounds and reasons and its length does not shock the conscience. Crenshaw consumed alcohol before driving his car. Crenshaw invited Quintanilla, who was not with Crenshaw when he was drinking alcohol, to go on a ride with him. Crenshaw drove at speeds over 100 miles per hour on a two-lane rural road in the oncoming traffic lane. Quintanilla suffered life threatening and altering injuries. Crenshaw knew that Quintanilla was seriously injured or possibly dead but ignored opportunities to render aid or call for help and instead chose to flee on

---

[57] State v. Souther, 100 Wn. App. 701, 721, 998 P.3d 350 (2000).

[58] RCW 9.94A.585(4).

[59] State v. Oxborrow, 106 Wn.2d 525, 531, 723 P.3d 1123 (1986) (quoting State v. Strong, 23 Wn. App. 789, 794, 599 P.2d 20 (1979)).

[60] State v. Ritchie, 126 Wn.2d 388, 396, 894 P.2d 1308 (1995).

[61] RCW 9.94A.585(5).

foot and hide in the woods. The sentence imposed by the trial court was significantly less than the sentence the State requested.

Under these facts, we conclude a 36-month sentence is not clearly excessive. Affirmed.

WE CONCUR:

Cox, J.